UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

CHRISTOPHER CUMMINS,

Defendant.

17 Cr. 00026 (JGK)

## SENTENCING SUBMISSION OF CHRISTOPHER CUMMINS

Evan T. Barr
Alexis R. Casamassima
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
One New York Plaza
New York, NY 10004
(212) 859-8000
evan.barr@friedfrank.com

*Counsel for Defendant*
  *Christopher Cummins*

Dated:  September 22, 2020

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

I.      PERSONAL BACKGROUND.................................................................... 2

    A.      Childhood............................................................................................ 2

    B.      College ................................................................................................ 3

    C.      Financial Industry Career.................................................................... 4

    D.      Post-Citibank Employment ................................................................. 6

    E.      New York City School Teacher........................................................... 7

    F.      Volunteer and Construction Work ...................................................... 9

    G.      Marriage and Family .......................................................................... 11

    H.      Sherry's Illness .................................................................................. 12

II.     OFFENSE CONDUCT AND COOPERATION ...................................... 15

    A.      The FX Investigation ........................................................................ 15

    B.      Decision to Cooperate ....................................................................... 16

    C.      Trial Testimony ................................................................................. 17

III.    SENTENCING GUIDELINES ISSUES .................................................. 18

    A.      Summary Of Presentence Report Findings........................................ 18

    B.      Consideration Of All Of The Factors Listed In 18 U.S.C. § 3553(a) Strongly Supports A Non-Guidelines Sentence........................................................................ 19

        1.      History and Characteristics Of The Defendant ......................... 20

        2.      Nature of the Offense ................................................................ 21

        3.      Need to Protect the Public......................................................... 22

        4.      Need for Deterrence ................................................................. 22

        5.      Need to Avoid Sentencing Disparities ..................................... 24

IV.     CONCLUSION......................................................................................... 26

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Case**

*United States v. SKW Metals & Alloys, Inc.*,
   195 F.3d 83 (2d Cir. 1999)......................................................................................................19

**Statutes**

18 U.S.C. § 3553 .................................................................................................. *passim*

18 U.S.C. § 3572....................................................................................................................23

**Rule**

U.S.S.G. § 2R1.1....................................................................................................................18

Defendant Christopher Cummins, through undersigned counsel, respectfully submits this memorandum in connection with sentencing in the above-captioned case.

## PRELIMINARY STATEMENT

Christopher Cummins has worked hard his whole life and has never been handed anything.  As the child of middle-class parents growing up in a modest New Jersey suburb, he learned at an early age the importance of faith and pitching in.  He took on odd jobs to help pay his way through college.  He excelled as a student at Fordham, participated in campus charitable activities, and then upon graduation took an entry-level job as a clerk in the financial services industry.  Over the next twenty years, he rose through hard work and talent to become a respected foreign currency dealer for Citibank, admired by his colleagues on the trading floor for his unusual kindness, generosity, and wisdom.

Aside from the instant matter, Chris has led an otherwise unblemished life as a dedicated father, husband and friend.  Since the lapse of judgment which led to this prosecution, Chris has done everything in his power to atone for his criminal actions.  He accepted responsibility for the conduct, pled guilty and agreed to cooperate with the authorities.  Over the course of the past four years, as we expect the 5K1.1 letter will describe, Chris rendered extraordinary assistance--both from a qualitative and quantitative standpoint--to the Department of Justice in its investigation and prosecution of other foreign exchange traders.  His long hours reviewing and interpreting the often arcane evidence, and his testimony from the witness stand, helped the Government to secure a guilty verdict against defendant Akshay Aiyer after a hard-fought trial.

Perhaps most impressively, Chris has weathered a number of setbacks since his conviction that truly demonstrate his sterling character.  Having lost his career in finance, he turned to teaching special education for the New York City Department of Education in the Bronx.  When that opportunity was taken away because of his felony conviction, Chris

persevered, eventually finding work doing manual labor to support his wife and family.  When his wife was then diagnosed with multiple myeloma, he helped her through every step of the harrowing treatment while simultaneously honoring his commitments to the Government and his employer, and never once complaining about the burden and pressure he faced.  Given the nature of the case, and our client's otherwise exemplary background and strength of character, we respectfully request that the Court impose a sentence of time served.

## I.    PERSONAL BACKGROUND

### A.    Childhood

Christopher Cummins was born on May 8, 1966 in New York City.  He grew up in a large Irish Catholic family in Mahwah, New Jersey.  His father, James P. Cummins, devoted his life to public service.  He enlisted in the U.S. Army, worked in the New York City Police Department, and spent the last 30 years of his career serving in the New York City Fire Department, retiring as a Captain in 1993.  His mother, Kathleen O'Connell Cummins, worked as a nurse at St. Vincent's Hospital in Manhattan, and later as a full-time homemaker.  Together James and Kathleen raised three boys (including Chris) and three girls.

Chris' childhood revolved around family activities.  They lived in a modest house on a cul-de-sac in a quiet, middle-class neighborhood.  Chris and his brothers shared a single room well into their teens.  Ex. 3 (James Gerard Cummins Letter).  The Cummins kids learned to enjoy the simple pleasures of suburban childhood, playing stickball in the street and miniature golf in the backyard.  Ex. 2 (Nancy Walsh Letter).  Each year, the family also enjoyed a summer vacation renting a two-bedroom cottage at the Jersey shore.  Ex. 5 (Kathleen Van Allen Letter).

James and Kathleen believed strongly in traditional Catholic values.  Ex. 2 (Nancy Walsh Letter).  On Sundays, the family attended mass at Sacred Heart Church in Suffern, where Chris served as an altar boy.  James and Kathleen also sent all of the kids to Catholic elementary and

2

high schools, despite the financial strain imposed by the tuition bills.  With his parents'
encouragement and support, Chris graduated from the all-boys Don Bosco Preparatory High
School in Ramsey, New Jersey in 1984, where he played basketball, soccer and baseball.

Chris also learned the value of hard work from his parents.  The kids were expected to
have summer jobs from a young age.  Chris started delivering newspapers when he was 11 years
old. Ex. 2 (Nancy Walsh Letter).  He and his brothers also would cut the lawn, shovel snow, and
rake leaves.  *Id.*  Chris eventually began working at a local grocery store, pushing shopping carts,
cleaning floors, and stocking shelves.  Ex. 3 (James Gerard Cummins Letter).  As he got older, to
start putting away some money for college, Chris also picked up some shifts behind the grill at
the local Friendly's restaurant, and helped his sister get a job there waitressing.  Ex. 5 (Kathleen
Van Allen).

B.    College

In 1984, Chris enrolled at Fordham University in the Bronx, attracted to its Jesuit
philosophy of education.  He studied business and finance and particularly enjoyed courses on
statistical decision-making and corporate finance.  He committed himself to participating in the
campus ministry and community outreach programs.  Ex. 4 (Kevin Cummins Letter).  Chris
derived enormous satisfaction by helping out in soup kitchens, handing out clothing and listening
to people in need.  *Id.*  In addition to his academic schedule and charitable activity, he also held
down various part-time jobs during college, including commuting home to New Jersey on
weekends to work at the same grocery store he had worked at in high school, to help his parents
pay for his tuition. Ex. 10 (Michael Acquilano Letter).  In 1988, he graduated from Fordham
with a Bachelor of Science degree.

C.     Financial Industry Career

After graduation, Chris got an entry-level job at JP Morgan & Company in its foreign currency authorization unit, where he performed quality control on trading tickets.  Presentence Report ("PSR") ¶ 94.  In 1990, Chris moved to Chase Manhattan as a loan administrator, manually inputting interest rates, executing interbank asset transfers, and calculating accrued interest.  A former colleague recalled how Chris took pride in his work and supported his team:

> He was extremely detail oriented, making sure his sovereign loan agreements were crafted with precision and high quality work.  Chris made sure myself, or other colleagues reviewed his assignments, to check for discrepancies, before submitting his work.  In return, he always managed to make time to review others work, and picked up the slack for colleagues who became overwhelmed with monthly deadlines.  In our line of work we had certain preparations and procedures to follow, but Chris would offer up ideas for more efficient productivity.

Ex. 12 (Steven Paolino Letter).

Chris joined Citibank in 1992, where he would remain for more than two decades.  He was initially hired at $15.00 an hour to document trade tickets.  In 1995, he was promoted to be an emerging markets fixed income trader.  Emerging markets represented the most interesting and exciting new frontier for economic and financial opportunity for many recent college grads, including Chris.

Two years later, Chris started as a foreign currency exchange ("FX") trader.  The FX desk principally served as a convenience, providing liquidity for valued clients of the bank, which included large corporations, well-established asset managers, and more speculative short-term players such as hedge funds.  While FX traders at Citibank did not typically take on risky proprietary trading positions for themselves or the institution, the bank did expect Chris and his

colleagues to generate a trading profit where possible.  This required presenting prudent bid-offer spreads to customers, and keeping a watchful eye on market developments.[1]

Success at FX trading required keen geo-political analysis, a command of macroeconomics, and the ability to perform well under pressure.  Chris thrived on the trading desk and was eventually tasked with managing seven highly active currency pairs, including the South African Rand, Turkish Lira, and Singapore Dollar.  Recognizing his talent and dedication, Citibank promoted Chris to Director in 2012, with additional responsibility for supervising a small team of more junior traders.

Other traders at Citibank admired and respected Chris for his down-to earth style and unflappable temperament.  Jose Gabriel Infante Gray, who joined the desk in 2008, recalled how Chris "didn't really shout or speak loud," and made himself accessible to junior traders even when busy: "[I]f you'd approach him, he would always turn around, look at you, listen what you had to say and talk to you.  This was extremely rare in that environment, where everyone is glued to their screens, trading whatever market was their specialty in a 'you eat what you kill' culture." Ex. 13 (Jose Gabriel Infante Gray Letter).   Mr. Gray also recalled that Chris would never take advantage of his senior status like others he had seen on Wall Street:

> In a trading desk is [sic] normal that the younger guys would go and fetch coffee, bagels or things of the sort for the older guys, it is how it always have [sic] been done in every trading desk in the world. But I noticed Chris would never ask for anything from the younger guys, on the contrary he would sometimes just walk downstairs to the cafeteria with them engaging in conversation and giving some advice.

---

[1]   Like most traders, Chris earned a base salary with potential bonus.  When he started in 1992, the base was approximately $33,000.  By the early 2000s, he received a base of around $175,000.  In addition, he generally received a bonus amounting to around 8 percent of his individual profit and loss, with potential discretionary upward or downward adjustments for factors such as the level of support he provided to the sales team and business and his ability to work with bank clients.  On occasion, the bank paid shares with a three-year vesting schedule in lieu of an all-cash bonus.

*Id.*

Chris also continued to find ways to be generous. As Perry Bornstein, a foreign exchange broker who has known Chris for many years recalled, each year his firm (ICAP) sponsored an event in which all revenues generated that day were donated to a variety of charitable causes. Ex. 14 (Perry Bornstein Letter).  According to Mr. Bornstein, Chris truly rose to this occasion:

> Chris showed his enthusiasm and kindness on this day.  He was sure to do as many trades as possible and he helped make it a special day [and] a successful one.  He went above and beyond. Without him we would not be able to support the many charities we donated to… [including] Save the Children, Refuges International, Boys and Girls Clubs of America, Leukemia and Lymphoma Foundation, Girls, Inc. and countless others.

*Id.*  Additionally, most Fridays after a catered lunch for the trading floor, Chris would round up a few of his colleagues, pack up all of the leftover food, and donate it to a nearby men's homeless shelter.

In the wake of an internal investigation commenced by the bank into anti-competitive conduct in the interbank chat rooms, Chris voluntarily resigned from his position in May 2014.

D.    Post-Citibank Employment

After his resignation, Chris had to find another way to support his family.  Given the circumstances of his departure, it became clear after several months of searching that finding comparable employment as a trader at a large bank or financial institution would be impossible. Chris did land jobs briefly at two smaller FX firms in New York but neither one proved to be a good fit in terms of matching his trading skill set or providing a sufficiently robust platform to support him as an employee.

Chris was at a crossroads.  He was 50 years old, with two children at home and virtually no prospect of continuing in his chosen career path.  Chris decided on a complete reset.  He had always dreamed about teaching.  His aunt and uncle worked in the public schools and his high

6

school algebra teacher had been a lifelong role model.  With his family supporting the decision, in the summer of 2016, Chris enrolled in geometry, calculus, and discrete math at Westchester Community College to brush up his skills.

      E.     <u>New York City School Teacher</u>

Shortly thereafter, Chris successfully applied for admission into the New York City Teaching Fellowship program, which at the time was exclusively focused on applicants interested in teaching in special education classrooms.  As a Teaching Fellow, Chris was required to complete a rigorous accelerated program designed to provide future teachers with the necessary coursework, experience, and resources prior to entering the classroom.  Chris spent the first three weeks attending skill-building sessions every weekday from approximately 7:00AM to 7:00PM.   Chris observed and practiced prioritized instructional and classroom management techniques, such as learning to design lesson plans and how to clearly communicate academic material to students.

In addition to these sessions, Chris began student teacher training in September 2016 at the Bronx Writing Academy, assigned to sixth grade science.  Chris would meet with the teacher before the school day to devise a lesson plan and then assist in the classroom during school hours.  Through this experience, Chris had the opportunity to work closely with English language learners and students with special needs.  On top of his already packed schedule, Chris also enrolled in a master's degree program at City College in the fall of 2016 where his coursework focused on teaching students with special needs.  Chris anticipated finishing the degree, a two to three year commitment, while working full-time.

Chris excelled in the Fellows program, and felt he had found a satisfying way to give back to the community and develop a new career.  In the three evaluations of his performance made over the course of a six-month period, Chris received perfect or near perfect scores in each,

and was commended by his peers and supervisor for his ability to draw students into the material he was presenting in a compelling way.  Chris also made a point to help other Fellows to thrive in the program.  As a former Fellow colleague, Tenneille Scott-Phillips, recalled in her letter, "Chris continuously helped through the teaching program with his positive outlook at situations because everyone knows it's not easy being in the Teaching Fellow Program coupled with the stress of being a Special Education teacher."  Ex. 17 (Tennielle Scott-Phillips Letter).

After completing the program, Chris applied for and received a full-time position teaching math at M.S. 80 Isobel Rooney Middle School in the Bronx.  Shortly after accepting the job, the school asked whether he would be amenable to teaching English instead to help fill a vacancy.  Eager to help, he agreed to step out of his comfort zone with numbers.  In December 2016, the school assigned Chris to teach three English classes, including two for students with special needs.  One of his fellow teachers at the school, Alice Wagner, recalled in her letter that Chris' "work ethic, professionalism and willingness to always give 100% percent to his job and coworkers truly impressed [her]."  Ex. 16 (Alice Wagner Letter).  Teaching in one of New York City's most underserved communities gave Chris a new sense of purpose that had been lacking in his earlier career as a currency trader.

This opportunity came to an abrupt end on January 12, 2017, when Chris entered his guilty plea in the instant case.  As a consequence, the Department of Education ("DOE") immediately suspended Chris from teaching and placed him into a probationary back-office role for the Committee on Special Education.  Although Chris was disappointed to leave the classroom, he tried to make the best of the situation.  Nancy Silva, a DOE school psychologist who worked closely with Chris while he served in this probationary role, recalled that "Mr. Cummins worked on the Individualized Education Program Review Meetings as a Special

8

Education Teacher where his input was of the utmost importance in the decision making process. His knowledge as a Special Education Teacher helped the team make informed decisions regarding the recommendation for Special Education services for the children we work with." Ex. 19 (Nancy Silva Letter).  Ultimately, the DOE denied Chris' requests for reinstatement, and he was formally terminated in July 2017.  With the loss of the teaching job in the Bronx, the Cummins family moved from their Westchester home in Sleepy Hollow to a more modest residence in Orange County, New York.

       F.    <u>Volunteer and Construction Work</u>

Chris was determined to not let unemployment define him.  Taking advantage of his free time, Chris volunteered at the Sloatsburg Food Pantry where he worked closely with the Director, Susan Meyer.  In her letter, Ms. Meyer recounted Chris' commitment to the pantry:

> Between 2017 and 2018 Chris volunteered during pantry hours (12:00 - 6:00 PM) twice a month, [and additionally] with deliveries once a month….Each month Chris would help unload over 7000 pounds of food from the North East Regional Food Bank in Albany. Those items would then need to be shelved and organized for our next opening.  I remember sending an email out to the volunteers seeking someone to assemble new shelves.  The boxes were heavy, instructions detailed and the task required patience and ample time to put them together.  Chris was quick to offer his assistance and got the job done for me, the pantry and therefore the clients!

Ex. 20 (Susan Meyer Letter).  Additionally, Chris worked closely with visitors to ensure they received premier service.  He did everything from pull cereal boxes off of high shelves for wide-eyed children to helping clients carry heavy food packages out of the pantry's basement storefront.  *See id.*  As Ms. Meyer recalled in her letter, "I was quite impressed with his level of dedication to serving others."  *Id.*

In August 2018, after another year of unemployment and dismal job prospects, Chris decided to pursue manual labor work through the International Brotherhood of Electrical

Workers.  In early 2019, he became an official member of the union, entitling him to certain key benefits.  He continues to work in this capacity today.

Chris obtains short-term work as a grounds-man on high-voltage line project sites in and around upstate New York.  Typically, Chris works with crew members to replace old overhead power lines with new cable lines underground.  As a grounds-man, he hands tools and materials, sometimes weighing up to 50 pounds, to the crew members, ensures that the proper equipment is available on the job site, and handles cables, conduit and other materials.  Often, Chris is required to work alongside crew members in underground vaults and manholes that are several feet underground and are classified by OSHA as "confined spaces."  Even with necessary protections in place, this work environment still presents numerous potential safety and health concerns, including life-threatening hazards such as toxic vapors, electrocutions, explosions, and asphyxiation.  Chris is therefore required to take certain safety precautions, including wearing a harness in the event he needs to be immediately lifted above ground.

An assignment typically lasts a few weeks, during which time Chris will earn between $35.00 and $39.00 per hour depending on the particular project.  His current work assignment is located in Rochester, New York--a four and a half hour drive from his home.  Due to the long distance, Chris has had to stay in Rochester during the work week.  He does this at his own expense and uses approximately one day of weekly pay to cover travel expenses and lodging accommodations.  Despite the hard work and reduced income, according to his wife, Chris "does this [job] with gusto as he wants to support our family.  He does not let pride get in his way although he is college educated. He does this for me and our children. He provides health insurance for us which at this juncture we cannot be without."  Ex. 1 (Sherry Bishko-Cummins Letter).

While thankful for the opportunity, Chris still faces economic uncertainty.  Upon completion of a particular project, his name is added to the bottom of a long list of other union members seeking work as grounds-man.  Chris can only be assigned after those individuals who are ahead of him have been offered employment first.  As such, Chris must sometimes wait weeks or even months for a new project; in the interim, he has no other source of income.

G.    Marriage and Family

In 1993, Chris married Sherry Bishko.  As Sherry recalls in her letter, they had a "common goal of building a home and having children" together.  Ex. 1 (Sherry Bishko-Cummins Letter).  Two years later, they settled in a modest home in Sleepy Hollow, New York, a historic small town along the Hudson River.  One of their long-time neighbors, Tang Di, stated in her letter that the "neighborhood love[d] Chris" and that they used to "call him C-squared" perhaps in jest of his straight-laced image.  Ex. 22 (Tang Di Garvey Letter).  She also recalled his generosity: "[o]n snow days you could find Chris helping neighbors to shovel the snow; if you need help moving heavy furniture, you call Chris."  *Id.*

In 1996, Chris and Sherry had their first child, John.  Three years later they welcomed a daughter, Amanda, to the family.  Chris was an "unbelievably devoted father."  Ex. 1 (Sherry Bishko-Cummins Letter).  As Sherry noted, he "was and is truly a co-parent.  He participated in our children's lives day to day.  He changed diapers and helped with homework."  *Id.*  As the kids grew up, Chris always found ways to stay involved.  "Whether it [] was coaching his son's little league team, cheering at football games from the stands or going to his daughter's dance and acting recitals, teaching them how to golf, he was always there supporting them."  Ex. 9 (Dominick Cristiano Letter).  Sherry recalled how Chris "became a pillar in the community surrounding sports.  He assisted in youth football in our town and coached little league and travel baseball year after year for my son….Chris would get off the train from a work day that began at

11

5:00am and jump into a game to coach, support and lift up not only my son, but all of the boys -- whether they had skills or not." Ex. 1 (Sherry Bishko-Cummins Letter). Chris even gave up his own personal hobbies and interests to spend more time with the kids. As neighbor Ed Beusse recalls, Chris had spent many years trying to master the art of Tae Kwon Do, achieving black belt status, and the two of them used to take classes together. Ex. 21 (Ed Beusse Letter). In his letter, Mr. Beusse recalls asking Chris "numerous times to come back to [Tae Kwon Do] class but he didn't want to leave his family in the evenings and weekends." *Id.* "He said nothing was more important to him than being together as a family." *Id.*

Aside from his devotion to the family, Chris also made a firm commitment to support his wife's career as well. When the kids were toddlers, Sherry, who had spent almost a decade working for the United States Environmental Protection Agency's Regional Office in New York, expressed the desire to become an attorney. Despite the additional burden it might impose on his own grueling schedule, Chris strongly encouraged Sherry to pursue her ambition. In 2000, Sherry enrolled at Pace University Law School and proudly graduated three years later. In her letter, Sherry gratefully recounts how Chris helped her achieve this goal:

> Nobody in my life has supported me and cheered me on more than Chris. When John was three and Amanda one, I decided to go to law school. Everyone thought I was crazy -- full time law school with two kids. Chris didn't waiver in his support for me. He told me I could do it and said we would "figure it out together." He worked 60 plus hours per week but would take the kids out to play and spend weekend days with them so I could study. He was exhausted, I was exhausted, but we did it together. He cheered me on and when I received my diploma he was holding John and Amanda in his arms and they were all waiving at me. He was selfless in allowing me to pursue my dreams. He supported me unconditionally which does not often happen in marriages. I was so lucky to have Chris.

Ex. 1 (Sherry Bishko-Cummins Letter).

H.     Sherry's Illness

On December 11, 2018, Sherry (just 50 years old at the time) was diagnosed with multiple myeloma, a cancer that forms in blood plasma cells. Because these cells create

antibodies that recognize and attack infections, multiple myeloma severely impacts the immune system.  Chris and Sherry were blindsided but determined to face the challenge together, like everything else in their life up to that time.

Chris demonstrated remarkable poise and devotion in caring for Sherry through these difficult circumstances.  As Sherry recalls, he "jumped into action helping me find the right treatment and holding my hand through six months of chemotherapy."  Ex. 1 (Sherry Bishko-Cummins Letter).  Chris drove Sherry to Memorial Sloan Kettering hospital for chemotherapy.  He was close by her side as they experimented with various medications and radiation, and held her hand at home during the awful side effects.  He took charge in organizing the medications and ensuring that Sherry followed the strict regimen established by her doctors.  He also embarked on learning every detail related to the illness in the hopes of choosing the best course of treatment.

Despite facing his own significant personal challenges (both legal and professional), Chris also managed to project optimism.  He was Sherry's number one cheerleader.  As his sister Nancy notes, Chris "has kept Sherry's spirits high and helped her cope with all of the devastating effects both physical and mental of this awful cancer diagnosis."  Ex. 2 (Nancy Walsh Letter).  And as Sherry poignantly recalls in her letter, "I lost my hair in clumps and was hysterical on our bathroom floor.  Chris held me and brushed out the clumps telling me I was beautiful no matter what."  Ex. 1 (Sherry Bishko-Cummins Letter).

In November 2019, after interviewing a number of doctors at various East Coast institutions, and considering all of the risks and benefits, Sherry and Chris decided to pursue a stem cell transplant.  Sherry had to quarantine at Memorial Sloan Kettering for six weeks in a sterile environment while awaiting the stem cells.  Ex. 7 (Allison Bishko Letter).  She was

permitted at most to be exposed to one or two family members.  Chris stayed by her side every morning and afternoon; on more than one occasion, Chris had to leave Sherry to testify during Aiyer's trial.  In her letter, Sherry recounted how Chris helped her through this harrowing experience:

> [The stem cell transplant] is a horrible process.  I lost my hair again, had my gastronomical track essentially burned with a high dose chemotherapy and lost the ability to hold food down.  I vomited again and again for days.  All through it, Chris was lying on the floor with me and cleaning me[.] [H]e put me in the shower when I could not stand up. He lost weight from not having time to eat because he wouldn't leave my side.

Ex. 1 (Sherry Bishko-Cummins Letter).

After a year and a half of treatment, Sherry's health has improved significantly but her immune system is still rebuilding and she will need to maintain her medications.  Insurance has covered most but not all of the expenses.  On the home front, when he is not at work, Chris has taken over things like grocery shopping, household chores, and helping transport their college-age daughter.  Now with COVID-19, furthermore, Sherry has been relying even more heavily on Chris since she is immune-compromised and must take extra precautions to avoid exposure to the virus.

With Sherry unavailable, Chris has also been more involved in caring for her father, John Bishko, who lives nearby and is recovering from a brain tumor operation.  "Chris visits with him frequently, helping him and simply keeping him company."  Ex. 9 (Dominick Cristiano Letter). This is not the first time that Chris has stepped up to assist elderly family members.  "Back in 2015 [Sherry's] mom was diagnosed with lung cancer.  Chris was always there to help with anything [the] family needed."  Ex. 7 (Allison Bishko).  Today, Chris also still visits his "80 year old mother who suffers from dementia and [] is rapidly declining."  Ex. 2 (Nancy Walsh Letter).

"He regularly takes her to Sunday morning mass and then breakfast at the local diner."  Ex. 3 (James Gerard Cummins Letter).

In short, as has been true for virtually his entire life, Chris consistently puts the needs of others first.

## II.     OFFENSE CONDUCT AND COOPERATION

A.     The FX Investigation

In the fall of 2013, media outlets began reporting that various regulators had been examining whether traders from competing financial institutions had engaged in coordinated trading using Bloomberg chat rooms to manipulate the FX market.  Many of the banks, including Citibank, started conducting internal reviews.

On April 30, 2014, as part of one such review, Chris was interviewed voluntarily at his workplace by counsel for Citibank regarding FX trading and chat room activity.  Chris did not have counsel present on his behalf.  He answered detailed questions for more than five hours. Chris appeared for a second interview on May 2, 2014 lasting about two hours, again without the benefit of counsel.  A few days later, believing it likely that the bank was going to terminate him based on the chat room activity, Chris decided to voluntarily resign.

Soon thereafter, pursuant to a standard indemnification agreement with Citibank, Chris retained the undersigned counsel.  On October 28, 2014, Chris appeared for a proffer session with the Government pursuant to a queen-for-a-day agreement.  In the proffer, Chris aided the Government investigators in understanding and interpreting the intricacies of the FX market. He decoded the arcane and confusing language used in the chat rooms.  He explained how traders (in particular Akshay Aiyer, Jason Katz and Nick Williams) would share spreads, withdraw bids and offers to assist each other, coordinate trades to affect the "fix" and trigger customer stop losses for the purpose of realizing additional profit.

B.    Decision to Cooperate

On March 21, 2016, Chris attended a so-called reverse proffer session in which the Government presented evidence it had collected thus far related to the chat rooms.  Immediately following that meeting, Chis decided to take full responsibility for his actions, plead guilty and cooperate.  He subsequently appeared for two lengthy proffer sessions on July 3, 2016 and July 8, 2016.  During these and subsequent sessions, Chris detailed a wide variety of collusive activity that had occurred in the ZAR and Old Gits chat rooms, focused on Katz, Williams, and Aiyer, as well as some other traders.

On December 21, 2016, Chris entered into a formal written cooperation agreement with the Government.  On January 12, 2017, pursuant to that agreement, Chris appeared before Judge Engelmayer and pleaded guilty to an Information charging him with a single count of violating the Sherman Act, Title 15, United States Code, Section 1.

Upon signing his cooperation agreement, at the direction of the Government, Chris began a massive undertaking to review audio tape recordings of virtually all incoming and outgoing phone calls made from his office line at Citibank over a multi-year period, including when the ZAR chat room had been active, to identify relevant and admissible evidence.  Between December 2016 and November 2019, when this project was finally completed, Chris commuted from his suburban home to DOJ's offices in lower Manhattan on more than 30 separate occasions to review the tapes, identifying various speakers and later conveying his impressions of the most important conversations to defense counsel for communication to counsel for the Government.  In all, he spent a remarkable *227 hours listening to 18,997 separate audio files*.

In May 2018, based in part on information obtained from Chris' cooperation, the Government filed an indictment against Akshay Aiyer charging him with participation in the Sherman Act conspiracy.  In subsequent months, Chris appeared on numerous occasions at the

Government's office, spending dozens of hours identifying pertinent portions of the Government's voluminous audio tapes, chat room transcripts and trading record evidence.  Chris also carefully reviewed virtually every transcript from the ZAR and Old Gits chatrooms, consisting of thousands of pages of discussions occurring over a multi-year period.  In the final run-up to trial, starting around October 2019, Chris also met with counsel for the Government on more than 10 occasions for lengthy witness preparation sessions.

     C.    <u>Trial Testimony</u>

On November 1, 2019, more than five years after the FX investigation began, and right before his wife was set to begin a stem cell transplant at Memorial Sloan Kettering, Chris took the witness stand to testify against Aiyer.

On direct, after providing background on the mechanics of the FX market, Chris explained how he first met Aiyer and established a close personal friendship.  He testified that he, Katz, Aiyer and Williams eventually developed an ongoing understanding that they would help each other out when another trader needed to buy or sell in the market to achieve a more advantageous price.  Chris testified that, pursuant to this understanding, Aiyer and the others would, among other things, only place one bid in the market, to avoid competing against each other.  In addition, Chris explained that when a client called around seeking multiple quotes from dealers he and Aiyer would work together to coordinate their pricing while making the client think it was competitive.

To illustrate these points, the government walked Chris through 24 different episodes, which included chatroom conversations, audio recordings, and/or trading data, exhibiting coordinated trading.  In addition to the types of specific conduct described above, in this process Chris (relying on his skills as a classroom teacher) carefully illustrated how, on different occasions, the conspirators would input bids/offers to manipulate supply and demand in the

market, simultaneously run stop loss orders to move the market price, share customer spreads and identities, hide bids/offers to conceal true demand, spoof orders, coordinate trades to influence the daily fix rate, and trick algorithmic traders to deal at prices in response to artificial changes in supply and demand.  In all, Chris testified for one and a half days on direct.

Chris faced two days on cross examination.  Defense counsel followed three basic strategies on cross.  First, defense counsel employed a fairly standard line of impeachment suggesting that Chris had not been sufficiently forthcoming prior to pleading guilty and that he had a motive to testify in order to obtain certain benefits under his cooperation agreement. Second, defense counsel attempted to show that Chris and Katz on occasion engaged in criminal conduct which did not necessarily involve his client.  Third, defense counsel sought to elicit testimony that on multiple occasions, even after coordinating in the chat room, each of the conspirators went on to make independent trading decisions.  None of these strategies succeeded in undermining Chris' credibility.

In summation, the Government was able to rely heavily on Chris' testimony.  Ultimately, on November 20, 2019, the jury found Aiyer guilty as charged in the indictment.

III.     **SENTENCING GUIDELINES ISSUES**

A.     Summary Of Presentence Report Findings

We do not dispute the Probation Office's calculation of the guidelines in this case. Pursuant to the November 1, 2018 Guidelines Manual, under U.S.S.G. § 2R1.1, the base offense level is 12.  PSR ¶ 42.  Because the conduct involved participating in an agreement to submit non-competitive bids, one level is added, pursuant to § 2R1.1(b)(1).  *Id.*  ¶ 43.  An 8-level increase is applicable, pursuant to § 2R1.1(b)(2)(D), based on the volume of commerce

($276,092,681) at issue.[2]  *Id.*  ¶ 44.  Factoring in a three-level reduction for acceptance of

responsibility, the adjusted total offense level is 18.  *Id.*  ¶ 52.  Under Criminal History Category

I, the Sentencing Guidelines range is 27 to 33 months of imprisonment.

Based on its analysis of the Section 3553 factors, however, the Probation Office believes

that a non-Guidelines sentence is warranted and has recommended that the Court sentence Chris

to time-served, to be followed by two years' supervised release, and no fine.

B.    Consideration Of All Of The Factors Listed In 18 U.S.C. § 3553(a)
      Strongly Supports A Non-Guidelines Sentence

After evaluating the Sentencing Guidelines and calculating a potentially applicable

Guidelines range, a sentencing court must consider the remaining Section 3553(a) factors in

order to "impose a sentence sufficient, but not greater than necessary," to comply with the

purposes set forth in 18 U.S.C. § 3553(a).  Sentencing courts have the obligation to consider

factors that were discouraged under the pre-*Booker* mandatory Guidelines regime, such as the

history and characteristics of a defendant, the nature of the offense, the need for deterrence, the

likelihood of recidivism, and the public's need for protection.  Sentencing courts are obligated to

evaluate these factors in order to determine the appropriate punishment for a particular

---

[2]  The Government has calculated the applicable volume of commerce based on approximately
38 different currency pair trades involving our client and a co-conspirator which occurred
between 2007 and 2013.  We believe this is a reasonable methodology under the case law.  *See,
e.g.*, *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 91 (2d Cir. 1999) (determining
volume of commerce "affected by" the conspiracy does not require a sale-by-sale accounting or
expert testimony).  We note, however, that the volume of commerce ($276,092,681) may
overstate the seriousness of the offense.  Individual trades frequently ranged between $10 - 20
million per transaction, with some as large as $80 or $100 million.  Since on any given trading
day, our client might have handled several hundred orders, the volume of commerce potentially
"affected by" the conspiracy rapidly becomes an astronomical figure that bears almost no
relation to revenue or profit associated with the activity.  For this reason, some critics have
questioned whether a dollar-driven volume of commerce calculation makes sense in measuring
an individual's relative culpability.

defendant, thereby "achieving somewhat more individualized justice." *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005).

        1.     <u>History and Characteristics Of The Defendant</u>

Under Section 3553(a), the court must consider "the history and characteristics of the defendant" when imposing a sentence.  18 U.S.C. § 3553(a)(1).  This factor permits sentencing courts to consider many aspects of a defendant's life when fashioning a fair and just outcome. Chris' personal history and characteristics strongly support a sentence of time served.

Aside from the instant case, Chris has led an exemplary life with a spotless record.  As the letters submitted to the Court will attest, Chris was brought up with a respect for hard work and traditional religious values.  As a student, he helped pay his way through college while remaining active in several charities.  In the workplace, he earned the respect of his fellow employees as a leader and mentor on the trading desk, and stood out in an otherwise competitive environment for always being willing to help others.  Perhaps most impressive of all, in the years since he left the bank, with his career prospects shattered, he has persevered in the face of adversity.  At age 50 (when some traders would be considering retirement), he courageously pursued a new career as a public school teacher for special needs students in the Bronx.  He did volunteer work and then took on construction jobs to support his family and put his kids through college.  Most recently, in addition to the stress of this case and his difficult work situation, he has stayed by Sherry's side night and day as she battled cancer.  While Chris makes no excuse for his criminal conduct, surely the bad is heavily outweighed by the many remarkable and good things that Chris has accomplished in his life.

Second, Chris accepted responsibility and agreed to cooperate with the federal authorities.  Over the past several years, he has rendered extraordinary and substantial assistance to the Government, spending literally hundreds of hours in reviewing tapes and documents,

deciphering trading activity and preparing for trial testimony.  His testimony on the witness stand, as the Government advised the Probation Office, "was an essential part of conveying to the jury the means by which the illegal agreement not to compete was carried out."  PSR at 26.

Third, Chris plays a key role in taking care of others.  Although Sherry is now doing better, she still needs Chris to assist on a daily basis as she gradually regains her strength following the stem cell transplant and subsequent treatments.  Chris also attends to his ailing father-in-law and needs to take on every available construction job to support the family financially, especially with one child still in college.  A sentence of incarceration would further disrupt the Cummins family (which has been through much trauma over the past year) and work a hardship on those who very much depend on his presence.

        2.    <u>Nature of the Offense</u>

Section 3553(a)(1) requires the Court to consider the "nature and circumstances of the offense."  In this case, we submit that the Court should take into account certain mitigating circumstances relating to the antitrust offense.

The trades associated with the chat room misconduct constituted only a very limited portion of our client's overall trading activity.  Chris executed literally hundreds of trades each day.  He did not (indeed could not) rely on the other chat room members in making most of these split-second trading decisions, a point which was established by defense counsel during cross examination.  In most instances over his long career, Chris carried out trades based on his own knowledge, intuition and experience in the market.

Also, while Chris engaged in the conspiracy to improve his trading profitability and avoid trading losses in order to boost his discretionary year-end bonus, it did not necessarily directly translate into the kinds of personal pecuniary gain often seen in white-collar financial cases.  Aside from P & L, Citibank took other factors into account in determining year-end bonus

21

including the overall performance of the bank, and subjective considerations such as client

support, teamwork, and communication skills.  In 2008, for example, Citibank paid lower

bonuses due to the financial crisis, and in subsequent years, the bank steadily sought to reduce

bonuses to the FX desk notwithstanding years featuring substantial trading profits, instead opting

to increase Chris' base salary, for example, from $175,000 to $250,000 at its peak.[3]

### 3.   Need to Protect the Public

In determining an appropriate sentence, the court must weigh the need to "protect the

public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  We submit that given

his character, prior unblemished history, compliance with release terms and successful working

relationship with government agents and prosecutors over the past four years, Chris does not

pose a meaningful risk of recidivism.

### 4.   Need for Deterrence

Another relevant factor is the need to "afford adequate deterrence to criminal conduct."

18 U.S.C. § 3553(a)(2)(B).  Here, we submit there is no need for a prison sentence to achieve

either specific or general deterrence in light of the substantial penalties Chris has already faced.

In terms of specific personal deterrence, Chris has lost his good name and reputation.

While he has no one to blame but himself, this felony conviction was a devastating blow to a

man who was widely admired in his community.  Chris cannot forgive himself for bringing

shame upon his two children while they were already going through tough times as adolescents

and also dealing with the life-threatening illness of their mother.  As Alice Wagner notes in her

letter, Chris literally punishes himself with small acts of contrition on a daily basis out of the

---

[3] In addition, upon his resignation on May 6, 2014, Chris forfeited 2,071.28 unvested Citibank shares (valued as of that day at $97,433) and approximately $52,101.27 in deferred cash compensation and accumulated interest.

guilt he feels for having imposed this hardship and humiliation on his family.  *See* Ex. 16 (Alice Wagner letter).

Chris has also lost his chosen profession.  He clearly will never be able to work for a bank or financial institution again, as the stigma of the conviction remains on the internet forever.  Even his desire to become a public school teacher is now impossible.  He faces a very uncertain economic future in which he must try to generate income as a 54 year-old man working on sporadic, unpredictable and physically demanding construction jobs.

Moreover, he has demonstrated genuine remorse and respect for the law by accepting responsibility and dedicating a significant portion of the past four years working tirelessly with government agents and prosecutors without complaint.  We submit that no further punishment is needed to deter Chris from further criminal conduct.

In broader systemic terms, imposition of a harsh sentence would not serve any meaningful additional deterrent effect on those who would contemplate committing a similar antitrust crime.  The Government has already sent a powerful message through its highly successful prosecutions of the three individual FX traders associated with this chatroom.  Many others have lost their jobs as a result of the scandal and various internal investigations, as well as the gradual replacement of human traders by algorithmic programs.  In fact, a harsh sentence for Chris under these circumstances would only serve to discourage future would-be cooperators and thereby undermine the Government's ability to successfully prosecute similar cases in the future.

Finally, the Government has also already obtained significant financial penalties associated with the unlawful conduct.[4]  Specifically, in 2014-15, Citigroup reached settlements

---

[4] Consistent with the Probation Office's recommendation, the imposition of a fine is not necessary to achieve the goals of sentencing.  In determining whether to impose a fine, courts should consider the defendant's income, earning capacity, and financial resources.  18 U.S.C. §

related to various FX trading violations with the Department of Justice, the Commodity Futures

Trading Commission, the Board of Governors of the Federal Reserve and the Office of the

Comptroller of Currency in which it agreed to pay fines and penalties of approximately $1.927

billion dollars to those agencies.  In addition, in August 2018, Citigroup also agreed to pay

approximately $400 million to settle a large class action pending in this Court related to the FX

misconduct, thereby providing substantial relief to victims such as hedge funds, pension funds,

and large institutional asset managers.[5]

### 5.    Need to Avoid Sentencing Disparities

Under 18 U.S.C. § 3553(a)(6), courts must consider the "need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  We respectfully submit that a sentence of time served would ensure that Chris

is treated fairly by comparison to others in his position.

In the FX antitrust context, we have not found any directly comparable sentences

imposed on cooperating defendants such as Chris who pled guilty and rendered substantial

assistance.  Mr. Aiyer, who refused to plead guilty, went to trial and was convicted.  He was

recently sentenced by Your Honor to 8 months in prison.  Plainly, in light of that outcome, a

---

3572(a)(1).  Despite Chris' modest lifestyle, his monthly expenses are often more than his
monthly income.  PSR ¶ 93.  This is primarily a result of the sporadic nature of Chris'
employment, which has become more infrequent due to the recent pandemic.  Chris is therefore
dependent on his limited financial savings to help make ends meet.  In addition to Chris' limited
financial means, the substantial assistance Chris provided to the Government weighs in favor of
the court not imposing a fine.  *See* Sentencing Tr. at 4, *United States v. Stewart*, 14 Cr. 272 (JSR)
(S.D.N.Y. Feb. 14, 2017), ECF No. 280 ("No fine will be imposed…in light of his
cooperation.").

[5] The Government is not seeking restitution from our client and notes that he may still be subject
to civil litigation.  PSR ¶ 37.

non-jail sentence for Chris would be necessary and appropriate in order to draw a meaningful distinction from Aiyer's case which recognizes Chris' very substantial and lengthy cooperation.

Sentences imposed on traders for rigging of the London Interbank Offered Rate ("LIBOR") in the Southern District of New York offer a useful comparison.  Several LIBOR defendants pleaded guilty pursuant to cooperation agreements, testified at trial, and subsequently received non-custodial sentences, despite facing very substantial Guidelines ranges tied to loss calculations in the LIBOR market.  *See, e.g.*, Sentencing Tr. at 64, 88-89, *United States v. Parietti*, 16 Cr. 373 (PAE) (S.DN.Y. Feb. 13, 2019), ECF No. 21 (three years supervised release and 500 hours of community service; Guidelines 78 to 97 months); Sentencing Tr. at 16, *United States v. Curtler*, 15 Cr. 670 (CM) (S.D.N.Y. Apr. 9, 2019), ECF No. 28 (two years supervised release; Guidelines 78 to 97 months); Sentencing Tr. at 2, 5, *United States v. Yagami*, 14 Cr. 272 (JSR) (S.D.N.Y. Mar. 9, 2017), ECF No. 285 (two years supervised release; Guidelines 33 to 41 months); Sentencing Tr. at 2, 3, *United States v. Stewart*, 14 Cr. 272 (JSR) (S.D.N.Y. Feb. 14, 2017), ECF No. 280 (two years supervised release; Guidelines 33 to 41 months); Sentencing Tr. at 2, 4, *United States v. Robson*, 14 Cr. 272 (JSR) (S.D.N.Y. Nov. 14, 2016), ECF No. 269 (two years supervised release; Guidelines 41 to 51 months).

Similarly, four cooperating defendants who pleaded guilty in another DOJ Antitrust Division prosecution filed in the Southern District related to a massive municipal bond bid-rigging scheme involving hundreds of millions of dollars also received non-custodial sentences. *See, e.g.*, Sentencing Tr. at 40, 42, *United States v. Rubin*, 09 Cr. 1058 (KMW) (S.D.N.Y. Mar. 12, 2014), ECF No. 449 (two years probation and 500 hours of community service); Sentencing Tr. at 15, *United States v. Campbell*, 10 Cr. 803 (KMW) (S.D.N.Y. Apr. 23, 2014), ECF No. 28 (time served of one day); Sentencing Tr. at 10, *United States v. Zaino*, 10 Cr. 434 (KMW)

(S.D.N.Y. Mar. 27, 2014), ECF No. 23 (time served of one day); Sentencing Tr. at 20, *United States v. Hertz*, 10 Cr. 1178 (KMW) (S.D.N.Y. Jan. 17, 2014), ECF. No. 38 (time served of one day).

Finally, judges in the Southern District have also found non-custodial sentences to be appropriate for cooperating defendants in a variety of white collar matters where they faced very substantial Guidelines calculations. *See, e.g.*, Sentencing Tr. at 25, 29, *United States v. Hill*, 15 Cr. 769 (AJN) (S.D.N.Y. Jan 30, 2018), ECF No. 725 (cooperator involved in bitcoin scheme sentenced to four years supervised release and 200 hours of community service; Guidelines range of 78-97 months); Sentencing Tr. at 4, 10, *United States v. Johnston*, 16 Cr. 406 (ALC) (S.D.N.Y. Jan. 19, 2018), ECF. No. 24 (cooperator involved in insider trading scheme sentenced to one year supervised release; Guidelines range of 70-87 months); Sentencing Tr. at 4, 12, *United States v. Goel*, 10 Cr. 90 (BSJ) (S.D.N.Y. Oct. 2, 2012), ECF No. 54 (cooperator involved in insider trading scheme sentenced to two years probation; Guidelines range of 46-57 months); Sentencing Tr. at 27, *United States v. Kumar*, 10 Cr. 13 (DC) (S.D.N.Y. July 20, 2012), ECF No. 52 (cooperator involved in insider trading scheme sentenced to two years probation; Guidelines range 37-46 months).

In sum, taking all of these cases into account, a non-custodial sentence for Chris would be fully appropriate and would help avoid sentencing disparities for similarly-situated cooperating defendants.

## IV.   CONCLUSION

As the letters to this Court reflect, Chis has lived by a credo of hard work, faith, and support for others.  Viewed in this context, the instant offense truly reflects an isolated lapse in an otherwise law-abiding and honorable life.

Chris has already paid a high price for his offense.  He has lost his successful career as a foreign exchange trader, and it is clear he is unlikely to ever obtain comparable employment.  He must now rely on a sporadic and unpredictable income as a laborer.  He has spent the past four years with this case looming over him.  He has worked strenuously to help the Government in its investigation and prosecution of other traders.

In the face of all this adversity, however, he has also shown a remarkable and inspiring level of resilience and optimism as he moves forward with his life and tries to take care of his family.  We believe those are the qualities that most accurately reflect the character of this good and decent man.

For all of the foregoing reasons, we urge the Court to impose a non-custodial sentence of time served.

Dated: September 22, 2020
       New York, New York

By:  s/ Evan T. Barr
FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON LLP

Evan T. Barr
Alexis R. Casamassima
One New York Plaza
New York, New York 10004
(212) 859-8951
evan.barr@friedfrank.com

*Counsel for Defendant*
*Christopher Cummins*