**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
UNITED STATES OF AMERICA                  :
                                          :
              v.                          :         No. 17-cr-00026 (JGK)
                                          :
                                          :
CHRISTOPHER CUMMINS,                      :
                                          :
              Defendant.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**UNITED STATES' SENTENCING MEMORANDUM REGARDING**
**<u>DEFENDANT CHRISTOPER CUMMINS</u>**

## TABLE OF CONTENTS

I.   The Nature and Circumstances of the Offense ........................................................................ 1

II.  Cummins's History and Characteristics ................................................................................ 3

III. Cummins's Sentencing Guidelines Calculations and Sentencing Range ............................... 4

IV.  A Substantial Fine is Warranted for Cummins ..................................................................... 5

## **TABLE OF AUTHORITIES**

**Federal Statutes**

15 U.S.C. § 1.............................................................................................................. 1

18 U.S.C. § 3553(a)(1)-(7)............................................................................................ 4

18 U.S.C. § 3571(b) ...................................................................................................... 5

18 U.S.C. § 3663A(c)(3).……………………………………………………………..5

On December 21, 2016, Defendant Christopher Cummins ("Cummins") entered into a plea and cooperation agreement with the Antitrust Division of the Department of Justice.  *See United States v. Christopher Cummins*, 17-cr-00026-JGK (S.D.N.Y.), ECF No. 6.  On January 12, 2017, Cummins voluntarily surrendered, waived indictment, and pleaded guilty to one count of violating the Sherman Act, 15 United States Code § 1, by conspiring with, among others, Jason Katz, Akshay Aiyer, and Nicholas Williams—all of whom specialized in Central and Eastern European, Middle Eastern, and African Emerging Markets currencies[1] ("CEEMEA" currencies)—to suppress and eliminate competition for the purchase and sale of the CEEMEA currencies by fixing the prices of those currencies when they were exchanged for dollars or euros in the United States and elsewhere.  *See United States v. Christopher Cummins*, 17-cr-00026-JGK (S.D.N.Y.),  ECF No. 13 Plea Allocution Transcript ("Plea Tr.").

Cummins's agreement to rig bids for, and fix prices of, CEEMEA currencies extended over many years and was deceitful.  The conduct flowing from that agreement undermined the integrity of the Foreign Exchange market, which is the engine of international trade and commerce.

I.   The Nature and Circumstances of the Offense

During the relevant period, Cummins was a senior CEEMEA currency trader at Citibank. In his role as a CEEMEA trader, Cummins formulated the prices to be quoted to customers looking to exchange large amounts of CEEMEA currencies for dollars or euros who called upon

---

[1] CEEMEA currencies include the South African rand ("ZAR"), the Russian ruble ("RUB"), the Turkish lira ("TRY"), the Hungarian forint ("HUF"), the Polish zloty ("PLN"), the Czech crown ("CZK"), the Israeli shekel ("ILS"), and the Romanian leu ("RON").

Citibank for pricing.  These customers included corporations, pension funds, investment managers, and hedge funds among other entities.  The process of quoting prices to customers who wished to exchange foreign currencies, or "market making," was subject to competition. Customers frequently called around to different banks in order to obtain the best price.  As Cummins testified, what he and his co-conspirators were doing amounted to deceiving customers so that "the client still thought it was competition going on for the business," when in fact the co-conspirators had agreed to not compete.  *See United States v. Akshay Aiyer* Trial Transcript ("Tr.") 241:21-23.

Additionally, Cummins's job was to offset the risk of customer trades by entering into offsetting trades in the "interbank" market.  Cummins could offset customer trades in a variety of ways, including by placing bids and offers in the Reuters trading platform.  The "interbank" market was also subject to competition, as CEEMEA traders and computer programs from rival banks continuously traded on the Reuters platform and other electronic venues to, hopefully, make a profit at their competitors' expense.

Cummins, however, had come to a mutual understanding with CEEMEA traders at competing banks so that, rather than compete, they would coordinate the timing of when each would enter the interdealer market so as not to "risk pushing the market higher and we would pay more and earn less money or concur losses."  Tr. 260:1-3.  The co-conspirators worked as a team to manipulate supply and demand on the Reuters platform and elsewhere.  They also took steps to hide their conduct from their customers, from their compliance departments, and from other competitors who were not part of their agreement.

Cummins gave extensive testimony at trial about how this opportunistic agreement was implemented. The government's Sentencing Memorandum for Defendant Akshay Aiyer highlighted many instances of fixing prices, as well as instances of bid rigging, that involved Cummins and section I is hereby incorporated by reference. (*See* ECF No. 221 at 2-8).

Though Cummins did not realize his conduct violated a federal law (Plea Tr. 24:3-6; 26:4-6), he knew that what he was doing was wrong. As Cummins testified, the purpose behind the big rigging and price fixing of CEEMEA currencies with co-conspirators Katz, Aiyer, and Williams was simply "to try to make more money trading." Tr. 166:16.

II.   <u>Cummins's History and Characteristics</u>

After receiving a bachelor's degree in finance from Fordham University in 1988, Cummins worked briefly in the Foreign Exchange back office at J.P. Morgan performing quality control on trade tickets. PSR ¶ 92. From 1990 to 1992, Cummins worked as a loan administrator at Chase Manhattan Bank. In 1992, Cummins obtained employment with Citibank and subsequently began trading foreign currencies. PSR ¶ 89. Cummins continued to work as a CEEMEA currency trader until he resigned from Citibank in April 2014. Thereafter, Cummins had brief periods of employment at two smaller trading firms until starting a training program at the New York Department of Education in August 2016. PSR ¶ 83. Though receiving good evaluations as a teacher, because of Cummins's felony plea in January 2017, he was terminated by the Department of Education. Cummins currently works for the International Brotherhood of Electrical Workers on projects that typically last a few months. PSR ¶ 81. Cummins is also the primary care-giver to his wife, who has a chronic illness. PSR ¶ 67, 69.

3

Cummins was relatively well-off during the charged conspiracy period.  He received both a six-figure base salary in addition to a bonus that was generally between 6-10% of the net profit that he made for his principal during the prior year.   *See* PSR ¶ 89.  A trader's annual bonus, as explained by Cummins at trial, was based on many "soft" factors but "at the end of the day it came down to profitability."  Tr. 621:11-20.

III.   Cummins's Sentencing Guidelines Calculations and Sentencing Range

Much of the Sentencing Guidelines analysis for Cummins is the same as set out by the government in its Sentencing Memorandum for Defendant Akshay Aiyer.  Accordingly, the government incorporates by reference section II. A., C., and D. 1-3. of that memorandum (*see* ECF No. 221, 18-cr-333-JGK), which discusses the applicable law, the seven factors outlined in Title 18, United States Code, § 3553(a)(1)-(7), the kinds of sentences available, and the volume-of-commerce calculation methodology.  18 U.S.C. § 3553(a).

For Cummins's volume-of-commerce calculation, the government adopts the same methodology as applied to Aiyer, with the addition of certain episodes of similar conduct prior to 2010 that involved Cummins.  The government has excluded instances that exclusively involved "spoofing" conduct or fake trades as it did for Aiyer, which were subject to a limiting instruction by the Court.  *See* Tr. 2142:16–2143:1.  Accordingly, the government calculated the volume of commerce attributable to Cummins on the following dates in reaching a total of $276,092,681: February 20, 2007 (USD/ZAR); March 5, 2007 (USD/TRY); April 23, 2007 (USD/ZAR); May 14, 2007 (USD/ZAR); May 23, 2007 (USD/ZAR); January 26, 2009 (USD/ZAR); May 25, 2010 (USD/SGD); September 9, 2010 (USD/ZAR); September 29, 2010 (USD/ZAR); October 15, 2010 (USD/TRY); November 15, 2010 (USD/ZAR); December 31, 2010 (EUR/RON); August

4

25, 2011 (USD/TRY); September 23, 2011 (USD/TRY); January 18, 2012 (USD/ZAR); March

16, 2012 (USD/TRY); April 2, 2012 (USD/ZAR); May 8, 2102 (USD/ZAR); December 12, 2012

(EUR/CZK) (*See* Gov't Ex. A)[2].

The government submits that Cummins's total offense level is 18.  PSR ¶ 52.  The base

offense level under §2R1.1(a) is 12, a specific offense characteristics addition of one level for

bid rigging pursuant to 2R1.1(b)(1), plus an addition of eight levels due to the volume of

commerce attributable to Cummins, which was approximately $276,092,681, *see*

2R1.1(b)(2)(D), totals an adjusted offense level of 21, prior to any adjustments for acceptance of

responsibility.  Under §3E1.1(a) & (b), Cummins, by demonstrating acceptance of responsibility

and by providing timely assistance to the government in its investigation and prosecution of

others, qualifies for an offense level decrease of three levels, for a total level of 18.  Cummins's

Criminal History category is I, and the resulting Sentencing Guidelines imprisonment range is

27-33 months (PSR ¶ 98).

IV.   A Substantial Fine is Warranted for Cummins

For the same reasons stated in the government's Sentencing Memorandum for Aiyer at II.

G. (ECF No. 221, 18-cr-333-JGK), the government does not seek restitution from Cummins.  *See*

18 U.S.C. § 3663A(c)(3).  However, as reflected in the PSR, Cummins has the means to pay a

fine.  PSR ¶ 96.  The applicable fine range is $20,000 to $1,000,000.  U.S.S.G. §2R1.1(c)(1);

§2R1.1 cmt. n.2; §5E1.2(c)(3), (c)(4), and (h)(1); 18 U.S.C. § 3571(b).  The applicable

---

[2]  In the government's Sentencing Memorandum for Aiyer (*See* ECF No. 221-1 "Exhibit A"), it attached summary exhibits which included dates relevant to Cummins's volume-of-commerce calculation that are hereby incorporated by reference: GX-S06, GX-S08, GX-S12, GX-S12B, GX-S20, GX-S21. GX-S22, and GX-S26.

Guidelines commentary explains that "[s]ubstantial fines are an essential part of the sentence." U.S.S.G. §2R1.1, cmt. Background.

The government is separately submitting a letter to the Court pursuant to Section 5K1.1 of the United States Sentencing Guidelines to set forth the details of the substantial assistance Cummins provided to the government in its investigation and prosecution of others for price fixing and bid rigging in the Foreign Exchange market.

Dated:  New York, NY
        September 28, 2020

                                            Respectfully submitted,

                                            /s/ Eric Hoffmann

                                            Kevin Hart
                                            Eric Hoffmann
                                            U.S. Department of Justice,
                                            Antitrust Division
                                            New York Office
                                            26 Federal Plaza, Room 3630
                                            New York, NY 10278
                                            212-824-1346


cc:     Evan T. Barr, Esq.
        Alexis R. Casamassima, Esq.
        *Counsel for Christopher Cummins*
        (by email)